# FILED

AUG 1 2 2005

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SYLVIA B. PIVEN as Trustee for the Leonard Piven Trust UAD 05/21/81, derivatively on behalf of AON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>PATRICK G. RYAN, EDGAR D. JANNOTTA, JAN KALFF, LESTER B. KNIGHT, J. MICHAEL LOSH, R. EDEN MARTIN, ANDREW J. MCKENNA, ROBERT S. MORRISON, RICHARD NOTEBAERT, JOHN W. ROGERS JR., CAROLYN WOO, GLORIA SANTONA, MICHAEL D. O'HALLERAN, and DAVID P. BOLGER,<br><br>Defendants,<br><br>AON CORPORATION,<br><br>Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. **05C 4619**

JUDGE ANDERSEN

MAGISTRATE JUDGE KEYS

**VERIFIED
DERIVATIVE COMPLAINT**

Plaintiff, as and for her verified derivative complaint, by her undersigned attorneys, alleges upon personal knowledge as to herself and her acts, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.    This is a derivative action on behalf of Aon Corporation ("Aon" or the "Company"), seeking to recover damages caused to the Company by its directors and senior officers who breached

their fiduciary obligations to the Company by taking part in and allowing the Company to breach its obligations to its clients, and violate state and federal business and securities laws. Named as nominal defendant is the Company, and as Defendants the Company's Board of Directors (the "Board") and its senior executive officers.

2.      This is also an action against Aon seeking relief under 8 Del. C. § 220 ("Section 220"), to compel compliance with Plaintiff's request to inspect the Company's books and records pursuant to Section 220.

## INTRODUCTION

3.      Aon is the largest reinsurance broker and second largest insurance carrier in the world. As a central player in a major worldwide industry, Aon serves many clients and holds many positions of trust and privilege.

4.      As detailed herein and in the actions filed by numerous state and private parties against Aon and its directors and officers, Aon's Board and senior management used Aon's position of trust to engage in an improper business plan to enrich themselves at the Company's expense.

5.      Under the leadership of Aon's long-time Chief Executive, Patrick Ryan, Aon engaged in a business plan which put the interests of Aon ahead of its clients. As an insurance broker, Aon is charged with securing for its clients the best insurance at the best price. However, rather than procure what was best for the client, Aon sought the largest "contingent commissions" on the deal. Through a series of kickback arrangements, bid-rigging operations and secret contractual deals, Aon steered clients to insurance business that brought Aon additional profit at the expense of its clients. It was a course of business which the Company stopped shortly after its disclosure and one that Ryan himself admitted was "improper" and something that he "deeply regret[ed]."

-2-

6.    Ryan and his fellow directors and senior officers served to enrich themselves through compensation and bonus awards that were tied to Aon's illegally manipulated and artificially inflated profits. As Ryan and the other senior officers (defendants, O'Halleran and Bolger) artificially raised profits, they were compensated with greater rewards. Yet, this improper scheme not only cost the Company millions in compensation and bonuses, but *hundreds of millions* in liability and loss of good will. To date, the Company has agreed to pay $190 million in fines and is subject to a series of compliance and reporting requirements over the next five years. The Company is also the subject of numerous civil actions which it is currently defending at great cost. The Company has further agreed to pay at least $38 million to settle class claims brought by Aon's clients in connection with Aon's unlawful receipt of contingent commissions. *See Daniel v. Aon Corp.*, No. 99 CH 11893 (Cook County, Illinois) (the "Daniel Action") (settlement pending).

7.    Throughout the relevant period, the Board knew of the improper activities. The Board was aware of all of these activities given the enormous profits they generated for the Company, the Board's close working relationship with Ryan and other executive officers, and its approval of Ryan's compensation that was based on the Company's financial performance. As alleged below, at least 25% of the Company's revenues during the relevant period came from unlawful contingent commissions.

8.    Upon the disclosure of these wrongdoings, plaintiff brought these allegations to the Board's attention on November 23, 2004, and demanded that the Board take action against the officers and directors responsible for exposing Aon to such large damages and other liability actions. Plaintiff's demand was ignored.

9.    Plaintiff has sought documents to determine why the Board had failed to address her

-3-

allegations. Again, Plaintiff's request was ignored.

## JURISDICTION

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1132(a)(1) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because nominal defendant Aon is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

### *Plaintiff*

12.     Plaintiff Sylvia B. Piven, as Trustee for the Leonard Piven Trust UAD 05/21/81, owns shares of Aon common stock and has held such shares during the relevant times complained of herein. Plaintiff is a resident of Baltimore County and a citizen of Maryland.

### *Defendants*

13.     Defendant Patrick G. Ryan ("Ryan") has served as Chairman of the Board and Chief Executive Officer of the Company since 1990 and 1982, respectively. Ryan retired as Chief Executive in April 2005. He now serves as Chairman. Ryan was elected President and Chief Executive Officer of Aon at the time of the merger of Aon and Ryan Group in 1982, and served as President of Aon until April 1999. Prior to the merger, Ryan served as Chairman of the Board and Chief Executive Officer of Ryan Group. He serves as Chairman of the Executive Committee of Aon's Board. Ryan owns 25.8 million shares of Aon, over 8%, and is the Company's largest individual shareholder. On information and belief, Ryan is a citizen of Illinois.

-4-

14.     Defendant Edgar D. Jannotta ("Jannotta") has served as a Director of the Company since 1995. Jannotta serves as a member of the Executive Committee, Governance/Nominating Committee and Investment Committee of Aon's Boad. Jannotta served on the Organization and Compensation Committee of Aon's Board. On information and belief, Jannotta is a citizen of Illinois.

15.     Defendant Jan Kalff ("Kalff") has served as a Director of the Company since 2003. Kalff serves as a member of the Investment Committee of Aon's Board. On information and belief, Kalff is a citizen of Holland.

16.     Defendant Lester B. Knight ("Knight") has served as a Director of the Company since 1999. Knight serves as the Chairman of the Investment Committee and as a member of the Organization and Compensation Committee of Aon's Board (the "Compensation Committee"). On information and belief, Knight is a citizen of Illinois.

17.     Defendant J. Michael Losh ("Losh") has served as a Director of the Company since 2003. Losh serves as a member of the Governance/Nominating Committee, Investment Committee and Organization and Compensation Committee of Aon's Boad. On information and belief, Losh is a citizen of Ohio.

18.     Defendant R. Eden Martin ("Martin") has served as a Director of the Company since 2002. Martin is a partner of the law firm Sidley Austin Brown & Wood LLP, which provides legal services to Aon. Martin serves as a member of the Executive Committee and Investment Committee of Aon's Board. On information and belief, Martin is a citizen of Illinois.

19.     Defendant Andrew J. McKenna ("McKenna") has served as a Director of the Company since 1970. McKenna serves as Chairman of the Governance/Nominating Committee and

-5-

as a member of the Organization and Compensation Committee of Aon's Board. On information and belief, McKenna is a citizen of Illinois.

20.     Defendant Robert S. Morrison ("Morrison") has served as a Director of the Company since 2000. Morrison serves as a member of the Audit Committee and Organization and Compensation Committee of Aon's Board. On information and belief, Morrison is a citizen of Illinois.

21.     Defendant Richard Notebaert ("Notebaert") has served as a Director of the Company since 1998. Notebaert serves as the Chairman of the Organization and Compensation Committee and as a member of the Audit Committee and Investment Committee of Aon's Board. On information and belief, Notebaert is a citizen of Illinois.

22.     Defendant John W. Rogers Jr. ("Rogers") has served as a Director of the Company since 1993. Rogers served as the Chairman of the Audit Committee and as a member of the Investment Committee of Aon's Boad. On information and belief, Rogers is a citizen of Illinois.

23.     Defendant Carolyn Woo ("Woo") has served as a Director of the Company since 1998. Woo serves as a member of the Audit Committee and Governance/Nominating Committee of Aon's Board. On information and belief, Woo is a citizen of Indiana.

24.     Defendant Gloria Santona ("Santona") has served as a Director of the Company since 2004. On information and belief, Santona is a citizen of Illinois.

25.     Defendants Ryan, Jannotta, Kalff, Knight, Losh, Martin, McKenna, Morrison, Notebaert, Rogers, Woo, and Santona are referred to as the Director Defendants. Defendants Jannotta, Knight, Losh, McKenna, Notebaert, and Morrison are/were members of Aon's Organization and Compensation Committee and are referred to herein as the Compensation

-6-

Committee Defendants.

26.     Defendant Michael D. O'Halleran (O'Halleran) served as the President and Chief Operations Officer of the Company from April 1999 to September 2004. Since September 2004, O'Halleran serves as Senior Executive Vice President. Since 1995, O'Halleran has served as President and Chief Operating Officer of Aon Group, Inc., Aon's global insurance brokerage and consulting division. O'Halleran has also served in other significant senior management positions within the Aon group of companies since 1987. On information and belief, O'Halleran is a citizen of Illinois.

27.     Defendant David P. Bolger ("Bolger") has been the Executive Vice President, Chief Financial Officer and Chief Administrative Officer of the Company since 2003. On information and belief, Bolger is a citizen of Illinois.

28.     Defendants Ryan, O'Halleran and Bolger are referred to as the Officer Defendants.

29.     Because of the Defendants' positions within the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and business prospects. They were privy to such undisclosed information from internal corporate documents, communications with other officers and employees of the Company, and attendance at and documents received during management and Board meetings.

30.     The Defendants, as directors and/or senior officers of the Company had a duty, because of the positions they held, to conduct the affairs of the Company legally, in compliance with state and federal business practices and antitrust regulations, and disseminate complete, accurate, and truthful information about Aon's financial condition and business operations. The Defendants had a duty to correct promptly any public statements issued by Aon that had become false and

-7-

misleading.

***Nominal Defendant***

31.     Aon Corporation ("Aon" or the "Company") is a Delaware corporation with its principal executive offices located at 200 E. Randolph Street, Chicago, Illinois.  Aon is the world's largest reinsurance broker and second largest insurance carrier.  The Company has three operating segments: Risk and Insurance Brokerage Services, where it acts as an advisor and insurance broker; Consulting, where it provides advice and services to client for employee benefits, compensation, management consulting, communications and human resources outsourcing; and, Insurance Underwriting, where it provides specialty insurance products, including supplemental accident, health and life insurance, credit life, accident, health, and select property and casualty insurance products and services.

## SUBSTANTIVE ALLEGATIONS

**Background**

32.     There are three basic types of entities in the insurance industry. First, the clients — companies and individuals seeking to purchase insurance for their businesses, employees or themselves.  Second, the brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage. Brokers (such as Aon) represent the client, obtain price quotes, present the quotes to the client and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security or an insurance company's reputation for service or claims payment.  Third, the insurance companies which submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

-8-

33.     In this structure, the client makes two types of payments: (1) it pays its broker (such as Aon) an advisory fee or a commission for locating the best insurer; and (2) it pays the chosen insurance company premiums for the coverage itself. When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients – particularly large commercial clients – break out the broker's fee and pay it directly to the broker.

34.     In addition to the first commission payment described above, brokers such as Aon sometimes received another kind of payment, as well, but not one from the clients. These are called "contingent commissions" and come from insurance companies pursuant to arrangements generally known as "contingent commission agreements." The precise terms of these agreements vary, but they commonly require the insurance company to pay brokers based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and, (3) the profitability of the business placed by the broker.

35.     As contingent commission payments are not tied to any specific service, they are a pure profit item and contribute significantly to a broker's net income. Such was the case with Aon.

**Spitzer Investigation**

36.     On or about April 21, 2004, Aon and other insurance brokerage firms received subpoenas from New York State Attorney General Elliot Spitzer in connection with an investigation that Spitzer's office was conducting regarding the insurance industry practice of brokers placing business with certain carriers for personal benefit even if it wasn't in the best interest of their clients. At that time, Defendants had a duty to stop the unlawful practice but instead allowed it to continue.

37.     On October 14, 2004, Spitzer announced an investigation and prosecution of fraud within the insurance industry. On that day, Spitzer announced the filing and prosecution of an action against Marsh & McLennan Companies ("Marsh") for receiving special payments from insurance companies that were above and beyond normal sales commissions. These "contingent commissions" were characterized as compensation for "market services" but were, as Spitzer explained, rewards for the business that Marsh and its independent brokers steered and allocated to the insurance companies.

38.     Spitzer also explained that in addition to steering business to its insurance company partners, Marsh, at times, solicited fake bids, which deceived its customers into thinking that true competition had taken place. According to Spitzer:

> The insurance industry needs to take a long, hard look at itself . . . . If the practices identified in our suit are as widespread as they appear to be, then the industry's fundamental business model needs major corrective action and reform.

39.     Spitzer's probe was quickly widened to include other industry players. On October 18, 2004, the *Wall Street Journal* published a front page article titled "Risky Business: Insurers Reel from Spitzer's Strike." The article quoted Spitzer remarking "[i]t's the same kind of cartel-like behavior carried out by organized crime" and reported that Aon was "[n]ext on the hot seat" due to contingency commissions, steering and clawback schemes:

> Investigators are examining whether the Chicago-based firm improperly steered its customers based on fees from insurers and whether it engaged in bid-rigging. Mr. Spitzer is also probing whether Aon directed business to insurers willing to use its services when buying "reinsurance," or insurance coverage for insurance companies, according to people familiar with the matter. This practice, known as "tying" or "leveraging," might result in policyholders getting an inferior deal.

40.     The next day, on October 19, 2004, the *Wall Street Journal* reported:

Mr. Spitzer's office is investigating whether Chicago-based Aon Corp. steered business to insurance companies in return for lucrative business for itself, people familiar with the matter say. The business Aon wanted for itself, Mr. Spitzer suspects, involved arranging the insurer's so-called reinsurance – insurance policies for insurance companies. Such back-scratching could have disadvantaged Aon's corporate clients, which paid the firm to find them the best deals without regard to its own business needs.

41.    In four days of trading, from October 14 to October 19, 2004, on news of these

revelations, Aon's share price fell by more than 30%, a total of $8.35 per share.

**Aon Discloses Improper Business Activities**

42.    On October 22, 2004, Aon issued a press release announcing that "it is eliminating

its practice of accepting contingent commissions from underwriters." The press release stated:

Patrick G. Ryan, chairman and CEO, said, "Because trust and client satisfaction are top priorities for all of us at Aon, we are discontinuing a practice that has created enormous controversy and confusion. We cannot permit even the slightest impression of a conflict between acceptance of these commissions and our paramount obligations to our clients."

Contingent commissions are non-service-specific, volume- or profit-based compensation arrangements. The practice of contingent commissions developed over several decades as a means of compensating insurance intermediaries for services provided on behalf of insurers.

* * *

Mr. Ryan added, "We will work closely with insurance carriers, regulators and other constituencies to establish a new business model that ensures appropriate linkage of compensation to specific, measurable services in a way that is transparent, accepted and understood by our clients. We provide important services on behalf of underwriters; however, certain current compensation models must change."

Aon has begun winding down contingent commission agreements and expects to complete the process by the end of 2004.

43.    On October 25, 2004, the New York Times reported that Spitzer's

investigation of Aon had revealed "deceptive and coercive practices" at the

Company, including unlawful tying and steering arrangements. According to the

article:

> In six months of examining documents from insurance companies and brokers, investigators for the New York attorney general have discovered evidence at the Aon Corporation of deceptive and coercive practices, a person close to the inquiry said yesterday.
>
> . . . .
>
> At Aon, the person close to the case said, investigators have found documentation of brokers steering business to insurers that paid the company incentives. They also found another anticompetitive practice known as tying, a kind of pay-to-play arrangement in which brokers threaten to curtail sales for an insurance company unless the insurer lets the broker also arrange its own coverage needs or reinsurance. Fees on reinsurance, which insurers buy to reduce their risk, can run into the tens of millions of dollars.
>
> . . . .
>
> For decades, insurance brokers have taken hundreds of millions of dollars in payments annually from insurance companies that they ostensibly evaluate objectively on behalf of corporate customers, who pay fees to have their coverage arranged. The brokers insist that the payments from the insurers, called contingency fees or placement-service agreements, do not influence their judgment, and that they regard the money as an after-the-fact reward for a job well done. Since the late 1990's, brokers have been disclosing the payments, but only in general terms. And many of the people in charge of buying coverage for corporations, executives, known as risk managers, say they have been stunned by Mr. Spitzer's accusations.

44. On October 28, 2004, the Company issued a press release announcing financial

results for the third quarter of 2004. In 2004, alone, the Company disclosed that it collected *$117*

*million* in contingent commissions. The press release stated:

> Commenting on recent industry developments, Mr. Ryan said, "While recent allegations concerning our industry are extremely troubling, at Aon we have always been committed to our core values of integrity and acting in our clients' best interest. As the second largest insurance broker in the world, Aon is committed to playing a leading role in restoring the credibility of the industry. *We are in the process of terminating contingent commission arrangements, and we will work with clients,*

-12-

*insurance carriers and regulators to implement a new business model which ensures that we are appropriately compensated, while maintaining full transparency and the trust of our clients.*

45.     On February 9, 2005, Aon announced that it would set aside a reserve of *$50 million* to pay for a settlement of Spitzer's claims. Defendant Bolger acknowledged that the amount placed in reserve was an estimate which might be increased.

**Spitzer Files Suit Against Aon**

46.     On March 3, 2005, Spitzer, together with the New York State Insurance Superintendent, Connecticut Attorney General, Illinois Attorney General and the Illinois Acting Director of Insurance, announced the filing of a complaint against Aon in connection with the improper business practices alleged herein. The following day, on March 4, 2005, Spitzer announced the settlement with Aon of that action. According to a press release issued that day:

> The civil complaint filed today in State Supreme Court in Manhattan and the citation issued by the New York Insurance Department allege that for years Aon received special payments from insurance companies that were above and beyond normal sales commissions. These payments – known as "contingent commissions" – were characterized as compensation for "services to underwriters" but were, in fact, rewards for the business that Aon steered and allocated to the insurance companies. Industry representatives defend this long-standing practice as acceptable and even beneficial to clients, but Spitzer's office and the Insurance Department have uncovered extensive evidence showing that the practice distorts and corrupts the insurance marketplace and cheats insurance customers.
>
> In addition to promising to send business to its insurance company partners in exchange for cash payments, Aon also promised to place business with insurers in exchange for the insurer's agreement [to] use Aon's reinsurance brokerage services.
>
> Spitzer's complaint against the company cites internal communications in which top executives openly discussed these efforts to maximize Aon's revenue and insurance companies' revenues – without regard to Aon's clients' interests.

47.     Spitzer's action and settlement detailed allegations of misconduct against the

-13-

Company's long-time Chairman and Chief Executive Officer, Ryan. According to Spitzer, Ryan was instrumental in negotiating these unlawful agreements.

48.     As part of the settlement, Aon agreed to pay *$190 million* to a fund for eligible policy holders in addition to a series of structural and business reforms, including: (i) guidelines establishing permissible forms of compensation; (ii) a prohibition on contingent commissions; (iii) a prohibition on "pay-to-play" arrangements; (iv) a prohibition on bid-rigging; (v) a prohibition on "leveraging" of its reinsurance business; (vi) a prohibition on the inappropriate use of insurance wholesalers; (vii) mandated disclosures to clients; and, (viii) the establishment of training procedures and standards of conduct. The Company is further subject to a series of compliance, monitoring and reporting requirements, including annual reporting to the Attorney General for five years.

49.     Exhibit 1 to the settlement agreement includes the following statement of apology from Ryan:

> As these investigations have revealed, Aon and other insurance brokers and consultants entered into contingent commission agreements and other arrangements that created conflicts of interest. *I deeply regret that we took advantage of those conflicts. This conduct violated the longstanding principle embodied in our Code of Conduct and Aon's Values Statement that our clients must always come first. Such conduct was improper and I apologize for it.*

50.     These violations of trust – *admittedly* committed – have exposed the Company to substantial liability. To date, there are pending against Aon and its directors and/or officers, actions for federal securities, antitrust, RICO and ERISA violations. Defendants violated applicable principles of fiduciary law by concealing these "contingent commissions," and thus subjecting the Company to fines and penalties and civil judgments for federal violations totaling potentially tens – if not hundreds – of millions of dollars.

51.     These improper business activities served to artificially inflate the Company's earnings in violation of Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission rules. The Company further failed to properly report and disclose the illegal nature of its revenues.

**Aon's Improper Business Plan[1]**

### *Introduction*

52.     The prospects of receiving contingent commissions compelled Aon to disregard the interests of its clients and place insurance business not with carriers who offered Aon's clients the best products at the best prices, but with those carriers who agreed to pay Aon the highest commissions. Known variously as "placement service agreements," "market service agreements," override agreements," or "compensation for services to underwriters," Aon's business model involved the "steering" of it clients to preferred insurance companies which had entered into these types of contingent commission agreements with Aon.

53.     Unbeknownst to Aon's clients, Aon would steer clients to certain insurance companies (those with whom it had agreements) by manipulating the purportedly fair bidding process for insurance contracts. Similarly, Aon leveraged its retail insurance services over insurers by demanding that the insurers use Aon's reinsurance service in exchange for Aon's agreement to increase retail placements with the carrier. These arrangements became so routine at Aon that they were memorialized in contracts known informally as "clawbacks." The clawback agreements, like

---

[1]     These allegations are based on the filings made by Spitzer's office in connection with its action against Aon; parenthetical references are to documents filed therewith (emphasis added, unless otherwise noted).

-15-

contingent commissions, were governed by confidentiality clauses to ensure that Aon's retail clients did not know of Aon's incentive to steer their retail business to certain insurance carriers.

54. Aon's scheme was orchestrated at the highest corporate levels. Aon consolidated control over its contingent commission business by placing primary brokerage responsibilities in the hands of a small number of senior executives – the "Syndication Group," composed of Robert Needle (Managing Principal of Retail Syndication), Carol Spurlock (Managing Director of Commercial Risk) and Ronald Moyer (Managing Director of Financial Services) – who worked for O'Halleran and reported to O'Halleran and Ryan.

55. As a result of these pure-profit contingent commissions, Aon structured its business model to maximize this type of revenue, in violation of its trust and at the expense of its clients. As Robert Needle stated to his subordinates on July 1, 2003: "[w]e should continue to grow our book with Chubb and also Hartford and Wausau based on our favorable contingency agreements." (AON-1-000224)

### *Aon Steers Clients to "Preferred" Underwriters*

56. Contingent Commission agreements were so prevalent, that the Syndication Group ranked certain underwriters as "premier" or "partner" insurers based not on the price or service those insurers provided to Aon's clients, but on the amount of money those insurers paid in contingent commissions. Aon would then "steer" its clients to these preferred insurance underwriters. Regardless of the costs to the clients, Aon promoted the interested of the insurance companies with whom it had commission agreements.

57. Internal Aon e-mails state:

> With our override agreements with Chubb and Fire Fund, we need to direct

-16-

> all new business exclusively to them for the next month and beyond. Chubb should be the first choice for any risk with Fireman's Fund a second thought. (AON-32-015217) (November 24, 2001)

And another email states:

> [I]n the short term, we need to steer all submissions to Chubb. I am finding that most submissions are submitted to all three carriers and we all now [sic] what AIG will do to buy market share. We need to emphasize that AIG should only be used if there is an underwriting issue with Chubb, which we can address. If we approach AIG on all submissions, the reason for carrier chosen will always be rate and it will slow submission process. (AON-32-015171) (November 20, 2001)

58.    Aon executives repeatedly emphasized that business had to be steered to those insurance companies with which Aon had contingent commission agreements. For example, in March 2003, Carol Spurlock, who at the time was the head of Aon's middle market accounts, wrote to a colleague who had inquired whether business should be directed to Zurich, as it had not paid contingent commissions to the middle markets department during the prior year: "Going forward, we are going to push Zurich. I just today negotiated our incentive so that we will get paid next year." (AON-13-000228). Spurlock confirmed: "We did not have a middle market contingency last year, we do this year. So yes place lotz [sic] of business with [Zurich] . . . ." (AON-I 3-000446).

59.    Aon used its ability to steer clients as a means of pressuring, and in some cases punishing, insurers. For example, in December 2003, The Hartford Financial Services Group ("Hartford") decided to no longer use Aon as its broker for placing its own directors and officers ("D&O") insurance. In a discussion between Needle and top Hartford executives, Hartford offered to "make it up to [Aon]" by using Aon as its broker on Hartford's owner property insurance which had been previously placed without a broker.

60.    Defendant O'Halleran, Needles' boss, was not satisfied with this offer. In a

-17-

December 1, 2003, e-mail to Needle, O'Halleran stated "[i]s this a good trade off. Let's also take some business from them." (AON-6-004314). In response, Needle examined Aon's contingent commission agreements with Hartford, and suggested in a response to O'Halleran, dated December 3, 2003, that Aon keep its clients with Hartford only in insurance lines where Hartford paid Aon favorable contingent commissions. Further, Needle suggested that Aon could punish Hartford for the D&O decision by steering business away from it in the insurance lines where Hartford's contingent commissions were less favorable:

> In terms of taking business from [Hartford] our commercial [contingent commission] is favorable and I don't want to negatively impact. However, the D&O [Director and Officer] deal is not that attractive and Eric [Andersen, co-head of the Financial Services Group] and I have discussed trying to drive more end of year premium to our major partners in that line — AIG, XL and Chubb. (AON-6-004314)

61.     Aon used its ability to steer business as a way of pressuring insurance companies to sign contingent commission agreements. As one Aon executive informed an insurer that had not yet signed a contingent commission agreement:

> We have been operating on the good faith that this [contingent commission agreement] would be mutually agreed quickly after our meeting here in NY.

> Based on the fact that we are almost half way through the year, I will be advising our people in the field that we in fact don't Have a [contingent commission agreement] with [Industrial Risk]."(AON-6-003018) (June 16, 2003)

62.     Aon, in confidential communications, let it be known that it could easily manipulate which insurance underwriters received business. For example, in an email, dated April 14, 2003, from Spurlock:

> **Let me further confirm our ability to effect [sic] placement behaviors.** Our syndicators are evaluated on the percentage of their books that are with our "premier" markets. Each Regional Syndication Director is held accountable as well. This is a measurable, compensated item that each syndicator is financially motivated to drive.

(AON-6-018789)

And in another example (a letter, dated June 19, 2003):

> You asked me to [sic] other day why would Endurance want to become a strategic partner with Aon's investment in Endurance and the potential that your costs could increase slightly. We think there are a number of good reasons but a couple of the major reasons are as follows. ***First you would enjoy favored treatment over non-strategic partners.*** As mentioned previously you would have the opportunity to personally review the entire listing of all current treaty abstracts. This give [sic] you a unique opportunity to pre-select programs you are interested in participation [sic] as a reinsurer. ***Second on new programs you would have the first opportunity to quote and participate on the programs.*** On renewal business we would attempt to make room on a program you are interested in and or if an existing reinsurer declined to participate you would have the first crack at replace [sic] the expiring reinsurer. (AON-F-009696).

63.     Aon's steering scheme did not simply give certain insurance underwriters "favored treatment" or the ability to preview other bids, rather, it went so far as to rig the entire process of bidding for specific contracts. Disregarding its clients' interests, Aon would manipulate the bidding process to push business to preferred insurance companies.

64.     For example, In September 2003, Aon instructed Zurich that its quote of $246,922 for the workers compensation business of Fieldstone was "too low" and suggested that Zurich raise its bid before the bids were shown to the client. In this way, Aon sought to generate additional contingent commission revenue and help Zurich recoup funds Zurich had expended on an unrelated client's account, Pearistine Distributors, Inc. ("Pearistine").

65.     Three months earlier, Aon had sought insurance coverage for Pearistine. After the contract was bound, Zurich became concerned that it had provided coverage for a poor risk and to protect itself against that risk, paid $18,000 for an excess insurance policy. Zurich was upset about this additional cost and Aon offered to make up the $18,000 through future transactions with Zurich,

a strategic partner. Thus, in an e-mail, dated October 15, 2003, Spurlock promised Zurich that Aon would "re-imburse [sic] you folks for the Additional Reinsurance costs associated with umbrella coverage on Pearistine through 9-I." (AON-PL-000041). In a subsequent conference call, Aon' s middle market employees were told of Aon's undertaking on the Pearlstine account and were told to look for "opportunities" for Zurich, presumably as a means of "reimbursement."

66.     An opportunity presented itself when Fieldstone retained Aon to obtain a variety of coverages, including workers' compensation insurance. On September 18, 2003, Zurich provided a form quote to Aon that was broken down by coverage area. Zurich bid $246,922 for the workers' compensation insurance portion.

67.     Shortly after the initial bid was submitted to Aon, Aon contacted Zurich and suggested that Zurich could raise its quote without losing the bid. On September 26, 2003, Zurich provided a revised quote of $290,005 for the workers' compensation portion. Later, that bid was raised again to account for an increase in the number of Fieldstone employees covered. Nonetheless, Zurich's adjusted bid remained artificially inflated because it incorporated the revised inflated quote.

68.     On November 13, 2003, after the account was bound with Zurich, the Aon employee assigned to the Fieldstone account wrote to Spurlock to explain what had occurred:

> [W]e wanted to let you know that when we first started negotiating this deal with [the Zurich underwriter], his initial WC premium came in at $246,922. The expiring premium with the same payroll was *$283,532.* He quoted $36,610 less than expiring. *We came back to him and allowed him to increase his initial WC quote to approx. same as expiring, $283,532. We allowed Zurich to get more money on this. This is an example of AON letting Zurich have more rate and premium when we could have held them at a cheaper price.* (AON-FM-000208).

69.     The next day Spurlock wrote to the Zurich executive who had negotiated the agreement on the Pearistirie account. She attached the November 13, 2003, e-mail and stated:

[T]his *one deal gave you twice the amount compromised on the Pearistine account.*
Are we in agreement that we have now met that obligation? (AON-FM-000208).

70.  On January 5, 2004, Spurlock again wrote to Zurich and attached both the November

13 and 14, 2004, e-mails:

I never heard from you or [the Zurich executive] on this subject and we assumed that
you are in agreement with the statements made below [the November 13 and 14 e-
mails]. To refresh the circumstances surrounding this topic, remember that *we
agreed at a senior management level* to forgive the additional premium generated
by building the primary limit to $2M to Pearistine with the promise that we would
make it up to you in other business. This was done twice over on [Fieldstone].
(AON-FM-000207).

71.  A subsequent Aon internal e-mail from Spurlock, dated December 6, 2003, noted that

the inflated bid not only settled the Pearlstine debt to Zurich but helped Aon get closer to achieving

payout on its contingent commission goal:

Congrats again on Fieldstone. Not only was that a nice new hit, it certainly helped
us on two fronts. It obviously *helps to get us closer to our premium goal with
Zurich* and also to make the $18K in premium that they helped us out on
[Pearlstine], go away. *As I recall you were able to get them $36K more in premium
than they originally quoted to more than make up for what we owed them. That is
the way a National operation should work.* (AON-FM-000205)

72.  The insurance companies recognized that, with Aon directing business and

manipulating the bidding process, the cost of the contingency commission kickbacks could simply

be born by Aon's own clients, the same clients paying Aon to get them the most favorable insurance

policy. As one insurance industry e-mail described under the subject title "Aon PSA":

Have now processed the PSA on the above. They will have to work at it, but it
appears *their PSA could hit 2.5% this year. Let's load an additional 2.5% on their
premiums.*

73.  Under this business model, Aon's Consulting segment, like the Risk Services

segment, also entered into undisclosed national and local contingent commission or "override"

agreements that created incentives to steer business to maximize Aon's revenue. In 2003 alone, Aon

Consulting earned in excess of $20 million from such contingent commission payments. Aon

Consulting deceived its clients by telling them that contingent commission payments had no impact

on their rates. (AON-l2-012972-87). In fact, Aon knew insurers factored the undisclosed contingent

payments directly into their premiums. For example, one Aon Consulting executive suggested that

contingent commission agreements rewarding new business caused Aon Consulting "to move cases

to other carriers just to generate [contingent commissions]." (AON-14-000253). Another Aon

Consulting executive declared that the intent of its contingent commission agreement with the

Guardian Life Insurance Company "was and still is to incent our people to place business with the

Guardian." (AON-l4-00 1024).

74.     Contingent commission agreements functioned as both an inducement and a deterrent

for the insurers. Aon threatened insurers with fewer business opportunities when they sought to

reduce contingent commissions. For example, in an August 2002 e-mail, an Aon Consulting

executive warned UNUM Provident Insurance Company ("Unum") that "[d]ecreasing your renewal

compensation levels may have an adverse affect on how often our producers show your product."

(AON-14-000477). The following year, when Unum again sought to lower Aon Consulting's

contingent commission compensation, Aon replied:

> If we were to accept the proposed reduction, our compensation from Unum would
> be about 80% of the compensation we receive from Met and Mass Mutual. It's
> almost like you are telling us that we should place our new business with a carrier
> other than Unum so that we can make [more] money? (AON-l4-001117) (August 28,
> 2003)

75.     The centralized effort to steer business to specific insurance companies with whom

Aon had contingent commission agreements was done with the knowledge and direct participation

of the Company and its senior management. The Company then, in turn, relied on revenue generated by the undisclosed commission agreements and steering schemes to report quarterly income growth and strong EPS numbers and stave off further debt and credit ratings.

### *Reinsurance Clawback and Leveraging Agreements*

76.     Aon's steering and contingent commission spread with the help of Aon's reinsurance business and Aon Global Re ("Aon Re"), the country's largest reinsurance broker. Unlike the retail insurance market where the customer is an individual or business, the customer in the reinsurance market it a the insurer itself, seeking to cover risk created by its retail insurance policies. Aon Re and other reinsurance brokers represent insurers and advise them in selected reinsurance packages.

77.     This aspect of Aon's improper business model involved Aon selling out the best interests of its clients in order to get insurance companies to purchase reinsurance from Aon Re. As one insurer, reviewing an Aon compensation scheme, commented, "I can think of 5 ways we potentially pay aon [sic] on the same account." (LM 006157) (August 5, 2003) These included: (1) the standard commission, which would be disclosed to the client; (2) a national contingent commission agreement; (3) a local contingent commission; (4) reinsurance brokerage arising from the insurer's undisclosed commitment to use Aon Re's reinsurance services for facultative (policy-specific) reinsurance; and (5) a similar commitment to use Aon for the insurer's treaty (multiple policy) reinsurance. In addition, although not mentioned in the e-mail, when Aon Re placed the insurer's reinsurance business with one of Aon's partner reinsurers, Aon could also receive a reinsurance contingent commission.

78.     Aon's practice of leveraging its retail brokerage arrangements to obtain reinsurance business became so routine that it memorialized these arrangements in a variety of contracts known

-23-

informally as "clawbacks."

79.     Many of these "clawback" arrangements shared a similar pattern. Initially, the insurer would express displeasure at Aon Re's brokerage commissions and would threaten to shop around for competitive rates. In order to retain the reinsurance account, Aon Re would negotiate a "clawback," allowing it to reduce or eliminate the reinsurance brokerage discounts by steering retail insurance business to the insurer.

80.     These "clawback" arrangements were governed by confidentiality clauses (AONOOI 4304), and, therefore, Aon' s retail clients were not informed that Aon steered, or had incentives to steer, business to selected insurers in return for the insurers' commitment to use Aon's reinsurance services. In addition, through steering or promises of steering retail business, Aon Re gained a competitive advantage over competing reinsurance brokers that did not operate retail insurance brokerage units.

81.     Defendant O'Halleran was in a unique position to make sure Aon capitalized on the relationship between Aon Re and Risk Services because both business units reported to him and he personally negotiated many of the "clawbacks."

82.     Liberty Mutual, for example, entered into "clawback" agreements with Aon in 2002 and 2003. In 2002, Liberty Mutual expressed concern that Aon Re's brokerage fees in property reinsurance were too high and began exploring using a co-broker or moving its property reinsurance business to another broker. To retain the business, O'Halleran negotiated an agreement whereby Aon promised increased retail premium placement to Liberty Mutual in return for Liberty Mutual's continued use of Aon Re for its property reinsurance. (AON 0014304-09). As an added incentive, Aon Re provided Liberty Mutual with reduction on its reinsurance brokerage fees. (AON 0014307-

09). Aon then had the opportunity to recapture or "clawback" its lost reinsurance brokerage revenue, based on the volume or profitability of retail property business placed with Liberty Mutual. The terms of the agreement were secret, so purchasers of Liberty Mutual property insurance through Aon did not learn of Aon's incentives to funnel more business to Liberty Mutual in return for reinsurance brokerage commissions. (AON 0014306)

83.     Prior to entering into or renewing its "clawback" agreements with Liberty Mutual, Aon executives, on both the retail and reinsurance sides, including O'Halleran, discussed Aon's ability to steer significant business to Liberty Mutual. (AON-19-003790) (AON-F-008723). In one e-mail, dated August 30, 2002, Scott Clark wrote, "I'll speak with [head of Aon property retail department] about the reality of putting significant business into [Liberty Mutual] in order to trigger the partnership dividend." (AON-19-003790).

84.     In 2001, Aon entered into a similar clawback agreement with RLI Insurance company ("RU") that combined incentives for Aon to steer retail placements to RLI with incentives for RLI to use Aon Re for its reinsurance needs. The agreement, again negotiated by O'Halleran, called for Aon Re to pay RU a 20% rebate on all brokerage it paid to Aon Re for placing its reinsurance agreements. As an added incentive, Aon Re promised to pay RLI an additional 5% rebate on its reinsurance brokerage commissions if Aon did not produce 20% growth in annual retail premium to RLI. (RU 000993) (RUT 001000-01) (RLI 001291-92). Thus, the arrangement permitted Aon to "clawback" the 5% reinsurance rebate by producing 20% growth in retail business to RLI. (RU 001291-92). As RLT's president and chief operating officer explained in a July 27, 2001 letter to O'Halleran, linking the reinsurance rebate to retail growth provided "a very strong incentive for us to utilize AON Re as our primary reinsurance intermediary." (RLI 001000-01).

85.     In 2003, Aon Re further linked the relationship between its retail and reinsurance brokerages. On March 25, 2003, RU's president and Chief Operating Officer spoke with Aon Re's vice chairman, David Kelley, concerning the reinsurance business for RU's executive protection group. Kelley "committed to Aon' s delivering more [retail] business to RLI" in exchange for which, Aon would retain RU's reinsurance business. (RLI 001149-51). In a follow-up email, RLI also confinned Aon's promise "to produce $25M in retail premium production for the product line." *Id.* Neither Aon's retail incentives under its reinsurance agreements with RLI nor its commitment to produce $25 million in retail business to RLI was disclosed to Aon's retail customers.

86.     Aon entered into yet another "clawback" agreement with Travelers Insurance Company. In 2001, Travelers Bond communicated to Aon that it was considering moving its reinsurance brokerage business to Guy Carpenter, Aon Re's competitor. Aon Re offered a strategic partnership under which it would increase its placement of retail business to Travelers Bond if Aon Re maintained the reinsurance brokerage business.

87.     In a series of meetings with Travelers Bond executives, O'Halleran stated that if Travelers Bond continued to use Aon Re, Aon would commit to increasing its retail placements with Travelers. These meetings were followed by an formal offer sent from O'Halleran to the Chief Executive Officer and Chief Financial Officer of Travelers Bond, (STP 00002-05), providing that if Travelers maintained the reinsurance relationship, Aon would pay Travelers Bond $1.5 million and that Aon could eliminate or "clawback" Aon's payment if it increased its retail business to Travelers Bond. Ultimately, Aon and Travelers Bond entered into a clawback agreement on slightly different terms. Aon never informed its retail clients of any clawback agreement or its incentives to steer retail business to Travelers Bond.

-26-

### *Aon's Illustrative Relationship with Chubb*

88.     Aon's longstanding relationship with Chubb is illustrative of Aon's commission, steering and clawback schemes, as well as the interrelation of them all. In the summer of 2000, Chubb Executive Risk, a newly acquired Chubb subsidiary focusing on the insurance needs of business executives, conducted an extensive review of its insurance lines to determine how to structure its reinsurance purchases. Prior to being acquired by Chubb in 1999, Executive Risk had used Carvill America, Inc. as a reinsurance broker for its D&O reinsurance program.

89.     On June 19, 2000, Aon's chief reinsurance officer from its Philadelphia office wrote a memorandum to defendant O'Halleran describing his conversations with top Chubb executives about Aon Re's desire to handle Chubb Executive Risk's reinsurance. Chubb Executive Risk's president reacted negatively to the "One Aon" message, explaining, "Aon Re originally received the Chubb casualty reinsurance program some three years ago because of commitments made by O'Halleran /Ryan to Dean O'Hare regarding increased retail growth." Chubb believed that "this did not happen and, therefore, [Chubb's] attitude was so much for the leverage card." (AON-F-020487).

90.     Two months later, on August 29, 2000, the same Aon executive wrote a second memorandum to O'Halleran describing his meeting with three top Chubb executives about reinsurance. Once again, the Aon executive said that "any conversations we would have would be in the context of the overall Aon/Chubb corporate trading relationship." This time, Chubb's chief underwriting officer "became extremely angry and animated," and "strongly advised me 'not to go there'." (AON-F-020379) The Chubb executive explained, "[i]n Chubb's mind, Aon did not deliver on original promises made when [Chubb] awarded Aon Re the casualty reinsurance some three years ago." The Chubb executive raised a number of other areas of contention between Aon and Chubb,

-27-

including that the "Aon/Chubb relationship is deteriorating," noting that "[o]verall premium volume between Aon/Chubb down some $90,000,000." (AON-F-020379)

91.     Chubb had voiced similar complaints earlier that year in memoranda in July and August, 2000. (2CHUBB 000951) (2CHUBB 000962-63). In another correspondence, dated May 22, 2000, an executive from Chubb Executive Risk complained, "Pat Ryan is well-known for leveraging the scope of Aon's brokerage relationships. Can you ask him why they just moved $15,000,000 in non-profit D&O. . . business from me in Washington, DC . . . when at the same time you were soliciting [Chubb Executive Risk's reinsurance] business here in Simsbury?" (AON-F-020514).

92.     On September 13, 2000, Ryan and, Chubb's Chairman and CEO, Dean O'Hare, met for dinner at the Four Seasons Hotel in Chicago. (2CHUBB 000984). At some point prior to the meeting, Ryan had called O'Hare by telephone to inquire about Aon Re's bid to obtain Chubb Executive Risk's D&O reinsurance. O'Hare said he would look into the matter, but stressed to Ryan that Chubb was not happy with the current Aon relationship, as Aon was not giving enough retail business to Chubb.

93.     In preparation for the Four Seasons dinner, a Chubb executive spoke with O'Halleran and then briefed O'Hare on the issues to be discussed. Chubb's first priority was to stop the "bleeding" in new retail business by highlighting its contingent commission with Aon: "We need to tell them we are open for business *(e.g.,* their new business production) and are *paying* them extra for it." (2CHI.JBB-000978) (emphasis in original). The Chubb executive also told O'Hare that Aon Re would like to "quote" Chubb Executive Risk's reinsurance program. (2CHUBB-000979) (September 13, 2000)

-28-

94.     At the Four Seasons, Ryan stressed that Aon Re could do a better job for Chubb on its reinsurance business. O'Hare complained that Aon was not giving Chubb enough retail placements. With regard to personal lines, O'Hare told Ryan that he was concerned that AIG, a new entrant to the high-end segment of the market, was "trying to burn into the market" by offering lower prices than Chubb. After the meeting, O'Hare told his executives to look at the reinsurance business to "see what Aon can do for us."

95.     Despite these conversations, on October 11, 2000 Chubb Executive Risk recommended continuing with Carvill as the broker for the placement of a layer of the D&O reinsurance. (2CFIUBB 000906-911). Chubb's management in Warren, New Jersey agreed with Chubb Executive Risk's recommendation to keep the business with Carvill.

96.     On or about October 17, 2000, Ryan tracked down O'Hare, who was traveling in Brazil at the time, to discuss Chubb Executive Risk's reinsurance. After the call O'Hare – without consultation with other Chubb staff – told his secretary to notify his senior executives, who were still recommending Carvill, that Aon Re would receive the Chubb Executive Risk D&O reinsurance business. One Chubb executive recalls later joking with O'Hare about his decision to overrule his staff: "[Y]ou [sure] complicated my life as to timing" as Chubb Executive risk had already recommended Carvill, and the January 1, 2001 renewal date for the D&O reinsurance program was fast approaching.

97.     Notes taken by a participant in a conference call between Chubb and Carvill on the next day, October 18, 2000, purport to describe the conversation between Ryan and O'Hare:

> Dean O'Hare has promised Pat Ryan Aon will get the lion share of [Chubb Executive Risk's] reinsurances. Promise made some time ago and Ryan called Dean [O'Hare] in S.A. earlier this week to make sure promise being upheld. Told Dean

that Aon handling [reinsurance] is critically important to Aon and Chubb having positive relations and if Chubb give [reinsurance] to Aon Ryan willing to put his personal credibility and friendship with Dean on the line to make sure Chubb receive preferential treatment from Aon.

[Four Chubb executives] all opposed to the decision but believe this is a done deal and do not believe they can convince Dean to change his mind. (unidentified handwritten telephone memorandum)

98.     A second set of notes relates a conversation between a Chubb executive and an Aon executive on October 23, 2000 and were taken by the Aon employee upon being notified that Aon Re would get the D&O reinsurance. The notes state that the Chubb executive intended to talk to O'Hare about why he believed O'Hare had made the wrong decision. (AON-F0205 10). The notes add: "Dean made decisions w/out talking to anybody." *Id.*

99.     On October 30, 2000, O'Halleran wrote to Chubb to extend his gratitude for Chubb's D&O reinsurance business, and noted: "As promised, I am arranging a conference call with our financial services people, you and Executive Risk and also checking on personal issues." (CHUBB-035506).

100.     O'Halleran continued to monitor the Aon/Chubb relationship. On May 6, 2003, Robert Needle wrote to O'Halleran: "there is quite a bit of attention being paid to the Chubb relationship. We have 3 areas of focus and 3 corresponding PSA agreements," notably in the commercial insurance, D&O and personal lines areas. (AON-19-006333). Other top Aon executives also monitored the Chubb/Aon relationship. On October 6, 2003, Eric Andersen reported to Chubb:

I can tell you unequivocally that we have maintained a very aggressive pro-Chubb position as you have repositioned your book of business based on your allocation position. The growth in the middle market area, for example, has been very strong (much to the angst of your competitors who call weekly, pay a larger commission percentage and demand a greater share of that business based on their more active role on the primary placements for the large accounts). (AON-1-000537).

-30-

### *The Company's Previous Disclosures Were Inadequate*

101.    The previous disclosures made by the Company regarding its contingent commission arrangements were in the most general terms, woefully inadequate and failed to explain anything meaningful regarding the Company's improper practices. Indeed, in the Company's Annual Report on Form 10-K, for the year ended 2004, filed on March, 15, 2005, the Company reiterated its termination of contingent commission arrangements and went on to say that the Company was going to "establish a new business model that is *transparent, easy to understand and accepted by clients*" (emphasis added). The previous business model was, admittedly, deficient in all three respects.

102.    Aon has never adequately disclosed its contingent commissions. As late as September 2004, Aon's website stated that it "believes a foundation of trust between broker and client must be supported by disclosure and transparency. Disclosure of agreements and relationships with insurers is an important part of this relationship." http://www.aon.com/about/csu/csu_faq.jsp. However, Aon consistently misled its clients about the true nature of its compensation agreements and in many cases provided no disclosure whatsoever to its clients about the role incentives played in its placement decisions.

103.    On its website in 2004, Aon described the justification for its contingent commission payments to its clients and the public as follows:

> Aon performs activities and provides services of value to insurers, including providing access to its substantial distribution networks, pre- and post-placement technical services, sharing of Aon's knowledge and expertise as an industry leader, policy design and review, research and development, risk analysis, claims management, administration and other underwriting-related activities. Providing these services ultimately benefits our clients, the insurance markets and Aon.

http://www.aon.com/about/csu/csu_faq.jsp

-31-

104.    These so-called "services" were largely illusory and provided no real value to insurers. The "distribution" Aon cited is not a "service," but rather a necessary concomitant of Aon going to market on behalf of its clients, something Aon was duty bound to do as its client's agent and fiduciary -- and for which Aon was already compensated by legitimate fees and commissions from its clients.  Nor did the other vague "services" mentioned (such as "sharing of Aon's knowledge") justify any of the payments that Aon received in contingent commissions. Aon's disclosure to investors was no better. Aon never revealed to the investing public the true nature of its undisclosed compensation arrangements or the role they played in Aon's earnings.

### *The Benefits From the Improper Scheme*

105.    The contingent commissions collected by Aon were substantial and represented a significant percentage of the Company's net income.  It wasn't until the disclosure of the improper scheme, and the Company's subsequent announcements, that the public finally knew the dollar size of the scheme.

106.    On October 28, 2004, Aon issued a press release wherein it quantified, for the first time, the material impact of the contingency commission kickbacks.  The Company acknowledged that Aon recorded *$117 million* in contingent commissions for the first three quarters of 2004.  The following day, October 29, 2004, defendants Ryan, O'Halleran and Bolger participated in a conference call during which they revealed that they not only could quantify the revenue income from contingent commissions, but that Aon had taken in at least *$169 million* in kickbacks in 2003, including $52 million in the fourth quarter of 2003, and that, prior to the disclosure of the scheme, defendants expected to receive $50 million in contingent commissions in the fourth quarter of 2004. In 2003, alone, the kickbacks represented approximately 25% of the Company's net income of $628

-32-

million. And during the entire relevant period, the Company collected $245 million in contingent commission income, increasing its net income by some 27%.

107.    Because the contingent commissions were based on annual or semi-annual total business, insurers would provide Aon with millions of dollars in 100% margin (i.e., all income with no associated costs) revenue in a single lump sum. As described in an internal Aon e-mail written by Carold Spurlock, dated April 28, 2003: "[w]e have always had an extremely nice contingency with the excess folks at Zurich. We received a huge check from them on umbrella business last year." (AON-13-000446)

108.    Within Aon, the materiality of the contingency commission revenue was well recognized. Internal Aon e-mails highlight the importance of these kickbacks. An email written by Eric Andersen, dated March 9, 2004, explains:

> To provide commentary on the [contingent commission]. The revenue that arrives from the [contingent commission] are [sic] integral to our budget and profit from FSG [Financial Services Group]. When we are being evaluated, they look at the full picture of earnings. Our bonus pool is set as a percentage or revenue . . . . If our [contingent commissions] fall, our ability to use the percents that we use to pay individual brokers would need to be changed. In short, it is a critical factor in our business and has a direct impact on how much we can pay people in FSG. (AON-1-000106)

And in an email exchange with Andersen, Ronald Moyer, on January 27, 2004, wrote:

> [I]t is safe to say that, over the past couple of years, [contingent commission] money has funded our entire bonus pool as well as our investment hires and still contributed significantly to the bottom line of the company. Anyone who does not see that as advantageous for them personally is looking through the wrong end of their telescope. (AON-1-000110)

109.    Accordingly, during the relevant period bonuses were paid to defendants Ryan, O'Halleran and Bolger based on the Company's inflated performance as a result of these improper

contingent commission kickbacks.

110. Defendants Ryan, O'Halleran and Bolger received compensation, bonuses and stock options for 2003, as follows:

| Defendant | Compensation | Bonus Award | Option Award | Option Value |
|---|---|---|---|---|
| Ryan | $1,125,000 | $1,250,000 | 500,000 | $11,970,000 |
| O'Halleran | $1,000,000 | $900,000 | 200,000 | $4,788,000 |
| Bolger | $715,385 | $750,000 | 100,000 | $2,394,000 |

111. Defendants Ryan, O'Halleran and Bolger also received from Aon substantial automobile and aircraft allowances. According to the Company's April 12, 2004, Proxy:

(a) for Mr. Ryan, the value of company-provided automobile transportation in the amount of $56,926 and aircraft in the amount of $75,882 and an automobile parking allowance of $2,100; (b) for Mr. O'Halleran, the value of company-provided automobile transportation in the amount of $45,643 and aircraft in the amount of $16,748, an automobile parking allowance of $2,100 and professional services fees of $4,795; (c) for Mr. Bolger, the value of an automobile parking allowance of $1,925;

112. Defendants Ryan and O'Halleran received compensation and stock options for 2002, as follows:

| Defendant | Compensation | Option Award | Option Value |
|---|---|---|---|
| Ryan | $1,125,000 | 250,000 | $1,671,004 |
| O'Halleran | $1,000,000 | 120,000 | $802,082 |

113. Defendants Ryan and O'Halleran received compensation, bonuses and stock options for 2001, as follows:

| Defendant | Compensation | Option Award | Option Value |
|-----------|--------------|--------------|--------------|
| Ryan | $1,125,000 | 300,000 | $2,706,561 |
| O'Halleran | $1,000,000 | 120,000 | $1,063,395 |

114.    Defendants Ryan and O'Halleran received compensation, bonuses and stock options for 2000, as follows:

| Defendant | Compensation | Bonus Award | Option Award | Option Value |
|-----------|--------------|-------------|--------------|--------------|
| Ryan | $1,125,000 | $1,462,500 | 300,000 | $2,343,642 |
| O'Halleran | $1,000,000 | $1,300,000 | 190,000 | $1,140,890 |

## COMPENSATION COMMITTEE DEFENDANTS

115.    The Organization and Compensation Committee (the "Compensation Committee"), pursuant to a charter dated September 2002, is appointed by the Board to (a) discharge the Board's responsibilities relating to compensation of the Company's executives; (b) produce an annual report on executive compensation for inclusion in the Company's proxy statement in accordance with applicable rules and regulations; (c) provide recommendations regarding management successors; and (d) discharge the Board's responsibilities relating to compensation of the Companies directors and officers.

116.    Pursuant to this mandate, the Compensation Committee Defendants determine the base salary, short-term incentive compensation and long-term incentive compensation of the Company's officers. To do so, the Compensation Committee Defendants consult with Ryan to determine the salary and incentive awards to be given to the Company's executive officers and key

employees. In addition, the Company's so-called outside directors also review and approve Ryan's compensation based on the Company's performance. (Aon 2003 Proxy, filed April 11, 2003).

117. Ryan's own incentive awards, like other senior executives, are discretionary and "payable only if Aon achieves a predetermined threshold level of financial performance, as measured by earnings per share, subject to certain adjustments at the discretion of the Committee." (Aon 2004 Proxy, filed April 12, 2004).

118. The Compensation Committee Defendants thus based their decision to compensate Ryan and the other executive officers on Aon's performance and Ryan's own opinions. Having consulted with Ryan, the Compensation Committee Defendants knew about Aon's financial reliance on kickbacks and the improperly inflated financial results on which the Officer Defendants' compensation was based. The Board knew of the Company's reliance on contingent commissions based on the fact that these commissions made up 25% of the Company's revenues.

119. The Compensation Committee Defendants breached their duties to the Company by providing compensation packages to the Officer Defendants in excess of what they deserved based on Aon's improperly inflated results.

120. The Officer Defendants were unjustly enriched by these amounts in that they were undeserved and based on Aon's financial performance which was artificially inflated by them through the Company's improper business model.

## THE BOARD KNEW OF AON'S IMPROPER BUSINESS PLAN

121. Aon's Board is charged with supervising Aon's management, policies and financial affairs. To that end, the Board is charged with reviewing and approving the Company's business model and course of business. Because Aon's revenue from contingent commissions and other

-36-

improper arrangements accounted for 25% of the Company's annual revenue, the Board knew or consciously disregarded the fact that contingent commissions were an integral part of Aon's business model. In fact, because the entire Board, including the so-called outside directors, reviewed Ryan's compensation which was based on Aon's financial performance, 25% of which came from contingent commissions, the entire Board was aware of Aon's reliance on improper business practices.

122. According to Spitzer, the misconduct at Aon was "pervasive," had gone on "for years," and had been "central to Aon's business model" since at least 2001. (Spitzer, AON Settles Corruption Probe, dated March, 4, 2005; Spitzer Complaint, at ¶ 12)

123. In 1999 Aon was named in a civil class action brought on behalf of Aon's clients who purchased insurance through Aon and its affiliates and subsidiaries. The action alleged that Aon received improper contingent commissions at the expense of and to the detriment of its clients. The action, captioned *Daniel v. Aon Corp.*, No. 99 CH 11893 (Circuit Court of Cook County, Illinois), is now pending settlement. Consequently, Aon and its Board were aware of the impropriety of its contingent commission practice back in 1999. Curiously, Aon seeks as part of the settlement of the Daniel Action release of the claims asserted herein, even though the *Daniel* Action is brought by Aon's clients, against Aon itself. Aon did not disclose the existence of the *Daniel* class action in its SEC filings until March 2005 when it filed its annual report on Form 10k for 2004.

124. The Company maintained a Code of Ethics and a Code of Business Conduct which applied to, but was breached by, the Company's Board.

125. The misconduct extended to at least four different divisions at Aon: Aon Risk Services, Aon Personal Risk Management; Aon Re; and, Aon Consulting.

126.    The key figures in the misconduct were Aon's most senior officers, including Ryan

himself, who personally apologized for the misconduct saying that:

Aon and other insurance brokers and consultants entered into contingent commission
agreements and other arrangements that created conflicts of interest. I deeply regret
that we took advantage of those conflicts. This conduct violated the longstanding
principle embodied in our Code of Conduct and Aon's Values Statement that our
clients must always come first. Such conduct was improper and I apologize for it.

127.    Accordingly, it defies credibility and common sense to maintain that Aon's Board

was not aware of the systemic problems central to Aon's business plan. Indeed, they must have

known, especially since Aon was charged with this improper practice back in 1999 and continued

to engage in it. Otherwise, Aon consciously disregarded or exhibited the worst kind of bad faith by

condoning Aon's improper business model and allowing these improper practices to continue to the

detriment of the Company.

## DEFENDANTS HAVE DAMAGED AON

128.    As fiduciaries of Aon and by reason of their ability to control the business and

corporate affairs of Aon, the Director Defendants owed Aon obligations of fidelity, trust, loyalty and

care, were required to use their utmost ability to control and manage the Company's affairs in a fair,

just, honest and equitable manner, and were required to act in furtherance of the best interests of the

Company and its shareholders and not in their own personal interest and benefit.

129.    As senior officers of the Company, the Officer Defendants owed duties to the

Company to conduct its affairs in good faith, in furtherance of the best interest of the Company and

its shareholders and within the bounds of the law.

130.    In contravention of those duties and obligations, the Defendants caused Aon to

engaged in unlawful conduct which has severely harmed the Company. As described herein, the

Company must pay $190 million in connection with the settlement of Spitzer's action and $38 million for the Daniel Action. The Company has been exposed to enormous legal and other professional expenses in connection with the regulatory investigations, as well as to costs related to the onerous compliance and reporting requirements imposed on Aon by regulatory authorities. The Company's reputation has been severely damaged.

131. Defendants' conduct has also exposed the Company to a barrage of private litigation. For example, Aon's clients have filed antitrust and unfair practice litigation against the Company in state and federal courts. Aon shareholders have brought suit for violations of the federal securities laws as a result of the artificial inflation of the Company's stock as a result of these improper business dealings. Employees of the Company have also brought suit under the federal labor laws for breaches of fiduciary duty in connection with the Company's investment of retirement money in Company stock at a time when the Company knew such stock was artificially inflated as a result of the improper activities. Aon is now subject to potential civil judgments totaling tens – if not hundreds – of millions of dollars, in addition to the substantial legal and professional costs to be incurred in having to defend them.

## DERIVATIVE DEMAND MADE AND IGNORED

132. On November 23, 2004, by certified mail, Plaintiff made a demand on the Board of Directors of Aon Corporation (the "Board") concerning the allegations detailed herein (the "Demand Letter") (Exhibit 1).

133. By letter dated December 10, 2004, from D. Cameron Findlay, purported counsel to the Company's Board, Plaintiff was informed of the Board's receipt of the Demand Letter and the Board's investigation of the allegations contained therein.

-39-

134.    By letter dated January 10, 2005, from D. Cameron Findlay, Plaintiff was informed

that the Board considered the matters addressed in the Demand Letter. Mr. Findlay thus explained:

> As you may be aware, outside law firms have been engaged to investigate, *inter alia*,
> the issues in your letter, and these firms have been periodically reporting directly to
> the Board on those issues. Because the investigation is still ongoing, the Board
> intended to await the results of the investigation and consult with counsel before
> considering whether any additional actions are necessary at this time.

135.    Mr. Findlay's letter did not indicate who had been hired, what "issues" were being

investigated, or the status of that investigation.

136.    Several months later, by letter dated May 6, 2005, D. Cameron Findlay informed

Plaintiff that the Board was no longer considering Plaintiff's demand. Findlay sought to excuse the

Board's obligation to do so saying that the Company would first seek to resolve another shareholder

lawsuit filed many months after Plaintiff made her lawful demand. Mr. Findlay's letter thus

concluded:

> Because the Company will have to expend resources to defend against the *Sherman*
> plaintiffs' contention that demand to the Board is futile, the Board believes that it is
> prudent first to litigate that contention in the derivative action before responding to
> the demands in your letter.[2]

137.    The Board had an obligation to investigate the allegations contained in the Demand

Letter but instead chose to do nothing. Despite the passage of many months, the Board has not

informed Plaintiff about the status of the purported investigation by outside law firms. It is plain

from Findlay's letters that the Company is not investigating Plaintiff's claims and has ignored

Plaintiff's demand letter.

---

[2]    All three letter from D. Cameron Findlay, dated 12/10/04, 1/10/05 and 5/6/05, are
attached hereto as Exhibit 2.

138.     Plaintiff has no adequate remedy at law.

### SECTION 220 DEMAND MADE AND REFUSED

139.     On July 14, 2005, Plaintiff made a written demand under 8 *Del. C.* § 220 upon the

Company to inspect certain of its books and records (the "220 Demand") (Exhibit 3). Plaintiff made

the Demand under oath and directed it to the Company's principal place of business. Attached as

Exhibit A to the 220 Demand was a true and correct copy of a current brokerage account statement

evidencing beneficial ownership of common stock in the Company.

140.     Plaintiff seeks to inspect the books and records of the Company as described on the

list attached as Exhibit B to the 220 Demand, and incorporated herein by reference. By the 220

Demand, Plaintiff seeks to inspect and copy the following books and records:

a.     All minutes, records, documents and emails of Aon Corp. ("Aon" or the

Company") in connection with the investigation by the Board of Directors (the "Board") of Aon into

the subjects raised by the letter from Kenneth J. Vianale, dated November 23, 2004, to the Aon

Board (the "Demand Letter").

b.     All minutes, records, documents and emails of Aon evidencing the Board's

consideration of any facts adduced during the Board's investigation into the subjects raised by the

Demand Letter.

c.     All minutes, records, documents and emails of Aon in connection with Aon's

and/or its subsidiaries' and affiliates' business practice of using contingent commissions, as detailed

in the Demand Letter.

d.     All agreements entered into by the Company, and/or its subsidiaries' and

affiliates', that are commonly referred to formally or informally as one or more of the following:

-41-

contingent commission agreements, placement service agreements, market service agreements,

    e.     All minutes, records, documents and emails of Aon produced to the office of

    f.     All minutes, records, documents and emails of Aon in connection with the

    g.     All minutes, records, documents and emails of Aon in connection with the

    h.     All minutes, records, documents and emails of Aon reflecting the nature,

amount and payment of fines, penalties ane legal fees incurred in connection with the Spitzer action as well as any other action or matter implicating the Company's practice of using contingent commissions agreements, placement service agreements, market service agreements, override

    i.     All Aon insurance agreements that purport to indemnify the acts or omissions of the members of the Board from January 1, 2001 to the present.

    j.     All Aon documents reflecting the identity, background, and employment title

    k.     All Aon documents in connection with the compensation of the members of the Board and the Company's senior executive officers.

141.    The 220 Demand was delivered to the Company's principal place of business by Federal Express on July 18, 2005.

142.    Plaintiff's purpose for the 220 Demand is to investigate possible wrongdoing by the Company and its officers and directors and others relating to the use of contingent commission agreements, among other agreements and arrangements, which have injured the Company, as detailed in Plaintiff's Demand Letter.

143.    Plaintiff has complied fully with all requirements under Section 220 respecting the form and manner of making a demand for inspection of the Company's books and records.

144.    On July 25, 2005, Aon's Senior Litigation Counsel, Paul A. Henmueller, responded

to Plaintiff's 220 Demand. (Exhibit 4). In that letter, Henmueller stated that Plaintiff's requests were "massively overboard" and "subject to other deficiencies." However, the letter failed to specify any particulars explaining why all eleven of the document demands were overboard or deficient. In fact, one of the Delaware cases cited in the letter directly authorized Plaintiff's request for documents relating to the board's consideration of Plaintiff's Demand Letter. *See Scattered Corp. v. Chicago Stock Exchange, Inc.*, 701 A. 2d 70, 78 (Del. 1997) ("Plaintiffs have not taken advantage of the opportunity to bring an action under 8 Del. C. §220 to inspect minutes, reports and other books and records of the Exchange targeted at the process and findings of the board, the Special Committee and the Executive Committee in acting on this demand.")

145.    Henmueller's letter also stated that the Company would be prepared to "make certain information available for inspection" and invited Plaintiff's counsel to contact him to "discuss this matter further." Plaintiff's counsel promptly contacted Henmueller who directed Plaintiff's counsel to Aon's outside counsel at Sidley Austin, James Ducayet. On August 2, 2005, Plaintiff's counsel, who was informed that Mr. Ducayet was on vacation until August 8, 2005, left a message for Mr. Ducayet.

146.    On Tuesday, August 9, Mr. Ducayet informed Plaintiff's counsel that he was not prepared to discuss what the Company would produce until he talks to in-house counsel and counsel for the outside defendants. Mr. Ducayet further noted that in house counsel was on vacation until the following Monday. Mr. Ducayet further refused to produce any documents absent a confidentiality agreement.

147.    In failing to properly produce the requested material in the time period prescribed, the Company has wrongfully denied Plaintiff access to the materials in violation of section 220.

148.    Given the foregoing, Plaintiff seeks relief from the Court under 8 Del. C. § 220(c) to compel the inspection set forth in the 220 Demand.

## COUNT ONE

### Breach of Fiduciary Duty to Properly Operate Aon
### (Against All Defendants)

149.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

150.    Defendants had and have fiduciary duties of loyalty and care to ensure that the Company adopts and follows a competent and effective business plan. This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper business practices, state and federal laws, and GAAP.

151.    Defendants breached their fiduciary duties of loyalty and care by intentionally or recklessly approving, and/or deliberately and knowingly being indifferent to, Aon's deceptive, unlawful and illegal business plan and course of business.

152.    As a direct and proximate result, Defendants have exposed the Company to a $190 million fine, as well as lawsuits, which will result in significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT TWO

### Gross Negligence
### (Against the Director Defendants)

153.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

154.    The Director Defendants had and have a fiduciary duty to act with reasonable care to ensure that Aon operates with appropriate and adequate internal controls.

155.    The Director Defendants breached their fiduciary obligations by allowing and/or

being indifferent to the adoption of Aon's business plan in light of the lack of any appropriate or adequate internal controls. The Director Defendants acted with gross negligence, recklessness and/or bad faith in breaching these fiduciary duties.

156.    As a direct and proximate result, the Director Defendants have exposed the Company to a $190 million fine, as well as lawsuits, which will result in significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT THREE

### Abuse of Control
### (Against All Defendants)

157.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

158.    Defendants had and have the ability to control and influence Aon to act in the best interest of its clients and shareholders, and to adopt and follow a competent, effective and legal business plan. This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper business practices, state and federal laws, and GAAP.

159.    The Defendants misconduct alleged herein constituted an abuse of their ability to control and influence Aon, for which they are legally responsible.

160.    As a direct and proximate result, the Defendants have exposed the Company to a $190 million fine, as well as lawsuits, which will result in significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT FOUR

### Gross Mismanagement
### (Against All Defendants)

161.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

162.    The Defendants, by their misconduct, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Aon in a manner consistent with the operations of a publicly held corporation.

163.    As a direct and proximate result, the Defendants have exposed the Company to a $190 million fine, as well as lawsuits, which will result in significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT FIVE

### Breach of Contract
### (Against all Defendants)

164.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

165.    Defendants, as officers and/or directors of Aon, contracted with Aon, in exchange for substantial compensation and professional prestige, to act in the best interest of Aon and to cause Aon to operate lawfully.

166.    Defendants, by the actions and omissions detailed herein, breached their contractual obligations and commitments to Aon to act in the best interest of Aon.

167.    As a direct and proximate result, Defendants have exposed the Company to a $190 million fine, as well as lawsuits, which will result in significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT SIX

### Waste of Corporate Assets
### (Against the Compensation Committee Defendants)

168.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

169.    The Compensation Committee Defendants served on the Compensation Committee of Aon's Board and thereby had a duty to preserve corporate assets.

170.    The Compensation Committee Defendants wasted corporate assets by paying incentive based bonuses and stock options to certain of its officers and/or directors based on unlawfully inflated financial results, for which such incentive awards were not deserved and should never have been paid.

171.    As a direct and proximate result, the Compensation Committee Defendants are liable to the Company for the amounts so wasted, for which they are liable to the Company.

## COUNT SEVEN

### Unjust Enrichment / Constructive Trust
### (Against the Officer Defendants)

172.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

173.    The Officer Defendants, by their wrongful acts and omissions, were unjustly enriched at the expense of the Company.

174.    As a direct and proximate result, these Defendants are liable to the Company for the amounts so enriched.

175.    Plaintiff, as a shareholder and representative of Aon, seeks restitution from these defendants, and each of them, and seeks an order of this Court establishing a constructive trust, disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT EIGHT

### FAILURE TO COMPLY WITH 8 DEL. C. § 220
### (Against Aon)

176.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

177.     Plaintiff made a demand on the Company pursuant to 8 Del. C. § 220 on July 14, 2005 (the "220 Demand").

178.     Aon has failed to comply with that demand.

179.     Plaintiff seeks an order summarily requiring Aon to permit the requested inspection immediately or ordering such inspection as the Court may otherwise determine;

## JURY DEMAND

180.     Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays for judgment and relies as follows:

A.     Determining that each Defendant breached his or her fiduciary duty;

B.     Requiring the Defendants to account to the Company for their unlawful profits gained through compensation and bonuses during the relevant period and establishing a constructive trust for their deposit;

C.     Awarding Aon compensatory damages against Defendants in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

D.     An order summarily requiring Aon to permit the requested inspection immediately or ordering such inspection as the Court may otherwise determine;

E.     Awarding plaintiff his costs and disbursements and reasonable attorneys' and experts' fees and expenses; and,

F.     Granting such other and further relief as the Court may deem just and proper.

-48-

DATED:     Chicago, Illinois
             August 12, 2005

Respectfully submitted,

Richard M. Goldwasser
20 North Clark, Suite 1700
Chicago, Illinois 60602
(312) 372-3300

VIANALE & VIANALE LLP
Kenneth Vianale, Esq.
2499 Glades Road
Suite 112
Boca Raton, Florida 33431
(561) 392-4750

SARRAF GENTILE LLP
Ronen Sarraf, Esq.
Joseph Gentile, Esq.
485 Seventh Avenue, Suite 1005
New York, NY 10018
(212) 868-3610

PLAINTIFF'S ATTORNEYS

## PLAINTIFF VERIFICATION

I hereby verify that I have read the attached complaint prepared by my counsel. It is true

and correct to the best of my knowledge.

Sylvia B. Piven, Trustee